UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 20-21410-Civ-COOKE/GOODMAN

MIRCEA L HALMU,

    Plaintiff,

vs.

CLIFFORD BECK, JR.,

    Defendant.

_____/

### **ORDER GRANTING DEFENDANT'S MOTION TO STRIKE OR DISMISS**

**THIS MATTER** is before the Court upon Defendant Clifford Beck, Jr.'s Motion to Strike or Dismiss (the "Motion") (ECF No. 14), filed June 18, 2020. Plaintiff Mircea L. Halmu ("Plaintiff" or "Halmu") filed his opposition on July 2, 2020. ECF No. 17. Then Defendant Clifford Beck, Jr. ("Defendant" of "Beck") filed his reply brief in support of the Motion on July 10, 2020. ECF No. 19. Thus, the Motion is fully briefed and ripe for adjudication.

The Court having reviewed the Motion, the briefing, the record, and the relevant legal authorities finds for the reason discussed below that the Motion should be granted.

### **BACKGROUND**

Plaintiff filed his Complaint on April 1, 2020. ECF No. 1. Plaintiff is alleged to be a Miami Beach resident, and Defendant Beck is alleged to be a police officer who is employed by the Miami Beach Police Department. ECF No. 1, Compl. at ¶¶ 4-5. This is an action stemming from Beck's arrest of Halmu. On Tuesday, April 5, 2016 around 4 pm, Halmu, a sixty (60) year old resident of Miami Beach, Florida for over 35 years, was riding his bicycle Southbound on Meridian Ave in Miami Beach. *Id.* at ¶ 6. On this day, local residents and tourists to the Miami Beach area could be observed walking or riding their bicycles in the area. *Id.* at ¶ 9. Similarly, nothing about Halmu's conduct and actions while riding on his bicycle could be construed as suspicious or otherwise warranting or requiring a health check or other investigatory stop. *Id.* The location, moreover, is a residential area zoned RM-1 (Residential Multifamily, Low Intensity) that is not considered a high crime neighborhood, nor is it close to the MXE (Mixed Use Entertainment) district and has no bars or nightclubs in the immediate vicinity. *Id.* at ¶ 10.

Upon approaching the intersection of 15th Street and Meridian Avenue, Halmu noticed that Florida Power & Light (FPL) workers were changing a light pole. *Id.* at ¶ 11. The road was closed to motor vehicle traffic and wooden barriers were set-up to prevent cars from accessing the roadway. *Id.* Although the road was closed to motor vehicles, there were people walking on the road. *Id.* at ¶ 12. The sidewalk was also open to pedestrian traffic. *Id.* At all times, Halmu did not approach the workers and stayed well clear of the actual FPL construction site. *Id.* There were no signs or personnel at the location diverting pedestrian or bicycle traffic from the area. *Id.* After riding his bicycle another block, at the 1400 block of Meridian Avenue, Halmu noticed a single yellow tape strung across the roadway going out of the construction area. *Id.* at ¶ 13. Again, there were no signs or personnel at the location indicating that the area was closed to pedestrian traffic, or otherwise diverting individuals from walking through the area. *Id.* Additionally, the 1400 block of Meridian Avenue was situated away from any FPL workers or repair work. *Id.* A woman just in front of Halmu lifted the yellow tape and continued walking down the street. *Id.* at ¶ 14. Halmu approached the tape walking with his bicycle and intended to go around the tape from the roadway to the sidewalk. *Id.* However, after noticing other people cross directly under the tape from the roadway, Halmu did the same and left the construction area. *Id.* At no time did Halmu's actions impede or otherwise cause a disruption to the work being performed by the FPL workers, nor did his actions in any way endanger the safety of himself or others. *Id.* Halmu was never instructed or directed by any person to stop or proceed in any other direction. As Halmu walked out with his bicycle and left the construction area, he walked past Defendant Beck's vehicle, which was parked on the road outside of the construction area. *Id.* at ¶ 15. Defendant Beck at that time was sitting inside his police vehicle. *Id.* As Halmu was on the road, well past the yellow tape and Defendant Beck's vehicle, and while mounting his bicycle in order to ride away, he saw Defendant Beck get out of his vehicle. *Id.* Defendant Beck was wearing a green work outfit which was not the usual Miami Beach police uniform. *Id.*

While standing by the open door of his vehicle, about 10-15 feet away, Defendant Beck asked Halmu only one question: "Where are you coming from?" Plaintiff immediately answered Defendant Beck stating, "From up the road," and rode away on his bicycle. *Id.* at ¶ 16. Defendant Beck did not approach Halmu, ask any further questions, nor make any further indication by action or word that he wished to speak with Halmu further. *Id.* at ¶ 17. At no time did Defendant Beck give Halmu any order or other directive, other than to ask where he had come from, which Halmu

answered truthfully before leaving the area on his bicycle. *Id.* On information and belief, Defendant Beck did not question or stop any other pedestrian who had approached the area or who had similarly walked underneath the yellow tape. *Id.* at ¶ 18. Halmu had no reason based upon the conduct and actions of Defendant Beck, the lack of any signs in the area, and the conduct of other pedestrians on the roadway that he was in violation of any traffic or criminal laws. *Id.* On information and belief, at all times relevant, Halmu's actions did not in fact violate any traffic, criminal or other municipal ordinance laws. *Id.* at ¶ 19.

Unbeknownst to Halmu, and for reasons entirely unclear, Defendant Beck got back into his car and started following Halmu while he was riding his bicycle. *Id.* at ¶ 20. Defendant Beck did not use his siren, horn or PA system to notify Halmu of his approach. *Id.* Because Halmu's bicycle did not have any rearview mirrors, he was not alerted to Defendant Beck's approach. *Id.* In fact, Halmu, at all times herein, was unaware that Defendant Beck was following him in his police vehicle. *Id.* At the 1300 block of Meridian Avenue, Halmu turned onto Meridian Court, a narrow lane road. *Id.* at ¶ 21. Meridian Court is a "substandard-width lane" as defined by Florida Statute § 316.2065(5)(a)(3) as "a lane that is too narrow for a bicycle and another vehicle to travel safely side by side within the lane." *Id.* On information and belief, all officers within the Miami Beach Police Department ("MBPD") should be trained and informed about this provision in the Florida Statutes in order to safely navigate the roadway and effectuate their official duties. *Id.* Additionally, Defendant Beck should have known that MBPD Standard Operating Procedure (SOP #017), at III.D(3)(c) specifically forbids the use of deadly force (i.e., the intentional use of a motor vehicle to stop a bicyclist) "against misdemeanor and traffic offenders; (fleeing or not)." *Id.*

Halmu subsequently heard a running vehicle engine behind him. *Id.* at ¶ 22. Believing that a motor vehicle was approaching from behind, Halmu moved as close as possible to the side of the narrow alley. *Id.* Defendant Beck drove his vehicle closer than 3 feet alongside Halmu, and without any audible warning, turned his vehicle into Halmu with the intent to bump him sideways and stop his movement. *Id.* at ¶ 23. Defendant Beck's deliberate and intentional acts placed Halmu, an elderly man, in significant danger of serious physical injury and even death. *Id.* Defendant Beck should have known the provisions of Florida Statute § 316.083(1) which states that "[t]he driver of a vehicle overtaking a bicycle or other nonmotorized vehicle must pass the bicycle or other nonmotorized vehicle at a safe distance of not less than 3 feet between the vehicle and the bicycle or other nonmotorized vehicle." *Id.* at ¶ 24. Defendant Beck or any officer in his position, therefore,

should know that any attempt to pass or drive alongside Halmu while he was riding his bicycle on the side of the narrow alley at a distance closer than 3 feet apart would place Halmu in immediate danger to his safety and security. *Id.* Defendant Beck nevertheless failed to take any precautionary measures and intentionally drove his car alongside Halmu. *Id.* Such conduct can only be construed as deliberate, wanton and reckless, and was specifically calculated and intended to stop Halmu from proceeding down the roadway. *Id.*

After hitting Halmu with his vehicle, Defendant Beck accelerated and stopped his vehicle diagonally in front of Halmu with the intent of blocking him from riding his bicycle or otherwise restricting any further movement. *Id.* at ¶ 25. In fact, Defendant Beck's deliberate positioning of his vehicle at an angle left Halmu with no room or ability to pass. *Id.* When Defendant Beck's vehicle hit Halmu, the force of the vehicle pushed Halmu's leg against his bicycle chain, causing the moving chain to come off the chain ring. *Id.* at ¶ 26. The chain cut into Halmu's leg leaving a scratch and a grease mark on the inside of his leg. *Id.* Halmu lost control of his bicycle and crashed into a steel picket fence enclosure that was protruding into the roadway. *Id.* The front wheel of Halmu's bicycle barely cleared the steel picket fence, but the rest of his body went forward, and he crashed head-on into the fence. *Id.* The crash cracked the left lens of Halmu's sunglasses, opened a bleeding head wound above his left eyebrow, a cut under his left eye, a scratch on his nose, and other smaller wounds with glass fragments embedded into his face. *Id.* at ¶ 27. Halmu at first did not realize he was injured and bleeding, so he righted his bicycle and leaned it against the wall, before turning to face the narrow alley. *Id.*

By the time Halmu got up and righted his bicycle, Defendant Beck had already got out of his vehicle and approached Halmu. *Id* at ¶ 29. Halmu stated "Hey man, are you crazy? What did you do that for? You can get sued." *Id.* Defendant Beck responded threateningly, "Do you know what kind of policeman I am? Let's see some I.D." *Id.* Halmu took out his wallet from his left short's pocket in order to retrieve his driver's license. *Id.* at ¶ 30. While retrieving his driver's license, Defendant Beck noticed that Halmu had a concealed weapons permit. *Id.* At the same moment, blood from Halmu's head dripped onto his wallet and got into his left eye. *Id.* Halmu touched his hand to his forehead and saw that his palm was bloody. *Id.* Defendant Beck asked, "Where is your gun," to which Halmu responded, "In my pocket." *Id.* Halmu carries a gun for his safety and protection, and all times, had the gun properly holstered inside of his cargo pants closed

with a flap. *Id.* Halmu possessed a lawful concealed weapons permit authorizing him to carry the weapon, and at no time, brandished the gun or otherwise removed it from his pocket or holster. *Id.*

Halmu offered absolutely no resistance upon being stopped and held against his will after being hit by Defendant Beck's motor vehicle. *Id.* at ¶ 31. Halmu further made no attempt to flee or otherwise fail to comply with any lawful command or order at that time, or any time prior to Defendant Beck's intentional act of stopping Halmu with his car. *Id.* In fact, Halmu was never provided any reason for being detained against his will, or the reasons for the arrest. *Id.* Despite having no reason for the stop and Halmu exhibiting no resistance, Defendant Beck ordered Halmu to "turn around." *Id.* at ¶ 32. Halmu immediately complied with Defendant Beck's command and was placed in handcuffs. *Id.* Halmu was told by Defendant Beck to sit in front of his car while still being handcuffed. At all times incident to his stop and arrest, Halmu complied with Defendant Beck's commands and did not place Defendant Beck or any other person's safety in danger.

Shortly thereafter, an ambulance and paramedics arrived at the scene. *Id.* at ¶ 33. Halmu refused all medical treatment and indicated that he did not want to go to the hospital. *Id.* At this time, Defendant Beck continued to exhibit force by placing his hand on Halmu's shoulder and threatened to hold him down if he doesn't allow paramedics to "clean him up." *Id.* On information and belief, Defendant Beck's actions circumvented the rules outlined in the MBPD Standard Operating Procedure (SOP #017). *Id.* at ¶ 34. Defendant Beck failed to make any reporting of the use of excessive force to stop Halmu while riding his bicycle causing injuries to his head. *Id.* Approximately 15 minutes later, another police officer in a black uniform from Fort Lauderdale arrived at the scene. *Id.* at ¶ 35. Defendant Beck instructed this officer to drive Halmu to the MBPD station. *Id.* Halmu told the Fort Lauderdale police officer that Defendant Beck intentionally hit him with his police car and pointed to the shattered glass fragments from Halmu's left sunglasses lens laying on the ground next to the fence. *Id.* The Fort Lauderdale police officer responded, "Really? He bumped you," while looking at the lens fragments. *Id.* Defendant Beck never issued Halmu any traffic or other civil citation, nor did he provide Halmu with a notice to appear for violating any ordinance or statute. *Id.* at ¶ 36. Halmu was simply told by Defendant Beck that he was being arrested for resisting Defendant Beck's commands. *Id.* Defendant Beck placed Halmu's shattered sunglasses, wallet and holstered gun inside Halmu's hat on the hood of his car for inventory. *Id.* The paramedics took Halmu's bicycle to the MBPD station in their fire rescue van. *Id.*

While being transported to the MBPD station by the Fort Lauderdale police officer, Halmu overheard a phone conversation between Defendant Beck and the Fort Lauderdale police officer. *Id.* at ¶ 37. Defendant Beck gave specific instructions to the Fort Lauderdale police officer that he was to transport Halmu to the jail. *Id.* Halmu overheard the Fort Lauderdale police officer sound astonished by Defendant Beck's command and stated, "You want to send him to jail?" in disbelief. *Id.* On information and belief, the Fort Lauderdale police officer seemed to express doubts about Defendant Beck's request and even stated, "If they accept him", presumably referring to the injuries Halmu sustained. *Id.*

Halmu spent approximately five hours in confinement at the MBPD station. *Id.* at ¶ 38. Although Halmu had enough cash with him to post a bond, on information and belief, he was intentionally sent to jail even though the charges Halmu was being accused of were misdemeanors, and not felonies. *Id.* During the detention at the police station, Halmu was not allowed to make any phone calls. *Id.* Around 9:30pm, Halmu was transported from the MBPD station to the Miami-Dade County Jail, commonly referred to as the "TGK," where he was processed and then finally able to have access to a phone. *Id.* at ¶ 39. At around 1:30am, a bail bondsman posted bail of $1,500.00 for Halmu in order to secure Halmu's release from custody. *Id.* At that time, Halmu was legally entitled to be released from jail, but nevertheless was held in detention overnight at TGK, and only released from custody at 11:30am. *Id.* Some of Halmu's personal items were returned to him when he was released but Halmu had to make a separate claim to retrieve his gun and bicycle from the MBPD station 2 days later. *Id.* Because of Defendant Beck's actions, Halmu was deprived of his liberty and forced to spend over 18 hours behind bars. *Id.* at ¶ 40. A few days later, as a direct result of the cold temperature and unsanitary jail conditions at TGK, Halmu fell ill with a severe case of pneumonia. *Id.*

Halmu was charged by Defendant Beck with two criminal misdemeanor violations: 1) a First Degree Misdemeanor count of Resisting an Officer without Violence contrary to Florida Statute § 843.02; and 2) a Second Degree Misdemeanor count of willful failure or refusal to comply with any lawful order or direction of any law enforcement officer contrary to Florida Statute § 316.072(3). *Id.* at ¶ 41. Halmu never received a civil citation identifying or charging him with any offense with regard to improperly or unlawfully riding his bicycle on the road, going underneath the yellow tape, or committing any traffic or moving violation with regard to his conduct on that day. *Id.* at ¶ 42. Defendant Beck also never provided for signature, any notice or

other document describing or explaining the basis for any command to stop. *Id.* On information and belief, Defendant Beck filed a false arrest affidavit and omitted significant facts to conceal police wrongdoing under color of state law in order to avoid liability. *Id.* at ¶ 45.

On October 18, 2016, a nolle prosse was filed as to Halmu's first degree Resisting Without Violence charge and a dismissal was entered by the Court as to the second degree charge of willful failure to comply. *Id.* at ¶ 46. No other charges, civil infractions or other information stemming from the April 5, 2016 events were ever filed against Halmu thereafter. *Id.* at ¶ 47. As a direct consequence of the unlawful arrest, use of excessive force and detention, Halmu experienced severe psychological and emotional trauma, including insomnia and nightmares. *Id.* at ¶ 48.

Based upon the above allegations, Halmu brings claims for: 1) false arrest in violation of 42 U.S.C. § 1983; 2) excessive force in violation of 42 U.S.C. § 1983; and 3) malicious prosecution in violation of 42 U.S.C. § 1983. Moreover, in addition to nominal damages and attorney's fees and costs, Plaintiff seeks a declaration to acknowledge that Defendant Beck, while acting under color of state law, violated Halmu's civil rights and injunctive relief for the expungement of Halmu's arrest records.

## LEGAL STANDARD

### A. Motion to Dismiss Standard

Federal Rule of Civil Procedure 8(a) requires that a complaint "contain. . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). While this standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The standard requires the complaint to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N.A.*, 543 U.S. 506, 512 (2002) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). To provide the "grounds" for "entitle[ment] to relief," the complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility

when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When considering a motion to dismiss, the court must accept the allegations in the complaint as true and construe them in the light most favorable to the plaintiff. *Duty Free Ams., Inc. v. Estee Lauder Cos.*, 797 F. 3d 1248, 1262 (11th Cir. 2015) (citing *Murphy v. F.D.I.C.*, 208 F.3d 959, 962 (11th Cir. 2000)). However, this tenet is inapplicable to legal conclusions. *Iqbal*, 556 U.S. at 678.

### B. Motion to Strike Standard

Rule 12(f) of the Federal Rules of Civil Procedure permits a court to "strike from a pleading. . . any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). The purpose of a motion to strike is "to clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters." *McInerney v. Moyer Lumber & Hardware, Inc.*, 244 F. Supp. 2d 393, 402 (E.D. Pa. 2002). Motions to strike are considered "drastic" and are disfavored by the courts. *Thompson v. Kindred Nursing Ctrs. E., LLC*, 211 F. Supp. 2d 1345, 1348 (M.D. Fla. 2002). Generally, "a court will not exercise its discretion under the rule to strike a pleading unless the matter sought to be omitted has no possible relationship to the controversy, may confuse the issues, or otherwise prejudice a party." *Reyher v. Trans World Airlines, Inc.*, 881 F. Supp. 574, 576 (M.D. Fla. 1995).

### DISCUSSION

In his Motion, Beck seeks to strike or dismiss Halmu's request for injunctive relief. More specifically, Beck argues: 1) Halmu's request for injunctive relief, in the form of expungement of arrest records is not cognizable in federal court; and 2) Halmu lacks standing to seek injunctive or declaratory relief.

### I. Expungement of Arrest Records Is Not Cognizable Through A Section 1983 Action Against An Individual Officer

In opposition to Beck's Motion, Halmu argues "[t]his Court has explicit statutory authority under Florida law to order the Miami Beach Police Department ('MBPD') to apply for administrative expungement of HALMU's arrest records upon entry of a 'final order' that his arrest at the hands of BECK was made 'contrary to law. § 943.0581(2), Fla. Stat. ECF No. 17 at 2. This argument fails.

First, Florida Statutes § 943.0581(2) simply does not expressly state what Halmu claims it does. In relevant part, Section 943.0581(2) states:

> (2) A law enforcement agency shall apply to the department in the manner prescribed by rule for the administrative expunction of any nonjudicial record of any arrest of a minor or an adult who is subsequently determined by the agency, at its discretion, or by the final order of a court of competent jurisdiction, to have been arrested contrary to law or by mistake.

Fla. Stat. § 943.0581(2) (2020). Thus, the text of Section 943.0581(2) expressly limits its provisions to "a law enforcement agency". *Id.* In this action, Beck is the only Defendant and he is sued in his individual capacity. ECF No. 1, Compl. ¶ 5. Further, he is alleged to be a police officer *not* a law enforcement agency. *Id.* Accordingly, the present action is not directed against the appropriate defendant to secure relief under Section 943.0581.

Moreover, Section 943.0581(2), by its very terms, is not applicable unless and until there is a determination by an agency, at its discretion, or there is "a final order of a court of competent jurisdiction" finding that an arrest was made "contrary to law or by mistake." Fla. Stat. § 943.0581(2) (2020). Here, Halmu does not allege that a law enforcement agency has determined that his arrest was contrary to law. Nor does Halmu allege that a court has made a finding that his arrest was made contrary to law. Presumably, Halmu has filed this action to garner such a finding, but no such finding has been made yet. The Court's plain reading of the Rule governing the procedure for applying for an administrative expungement further supports this Court's interpretation of Section 943.0581(2). *See* Fla. Admin. Code Ann. r. 11C-7.008. Nonetheless, Halmu argues that "precedent exists in this Circuit and elsewhere that Federal courts are vested with the authority to order the injunctive relief contemplated in this suit." ECF No. 17 at 3. This Court, however, was unable to find a case on all fours with the present action. Meaning, this Court did not locate a case in which a Section 1983 action was brought against a law enforcement officer sued in his individual capacity and the presiding court directed the officer to expunge a plaintiff's arrest record prior to the entry of an order finding the arrest unlawful. Further, the cases to which Halmu cited do not support such a bold proposition either. The Court, therefore, finds that Beck's Motion to Strike or Dismiss Plaintiff's request for injunctive relief should be granted.

## II.  Plaintiff Has Not Alleged A Substantial Likelihood of Future Injury to Support His Entitlement to Declaratory Relief

Like his efforts to seek an injunction against Beck, in the form of an expungement, Plaintiff has also failed to properly allege entitlement to declaratory relief in this action. The Declaratory Judgment Act provides that a federal court "may declare the rights and other legal relations of any interested party seeking such declaration." 28 U. S. C. § 2201. "Article III of the constitution limits

a federal court's jurisdiction to actual cases or controversies." *Hunters Run Prop. Owners Ass'n, Inc. v. Centerline Real Estate, LLC*, 18-80407-CIV, 2019 WL 4694139, at *4 (S.D. Fla. Aug. 22, 2019) (citing *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125 (2014). To satisfy this requirement, a party seeking declaratory relief must show that there is a "substantial likelihood that he will suffer injury in the future." *Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342, 1346 (11th Cir. 1999). Without establishing a substantial likelihood of future injury, a party lacks standing to seek declaratory relief. *A&M Gerber Chiropractic LLC v. GEICO Gen. Ins. Co.*, 925 F.3d 1205, 1210–11 (11th Cir. 2019).

The Declaratory Judgment Act contains a similar limitation; it requires an "actual controversy." 28 U.S.C. § 2201; *see Emory v. Peeler*, 756 F.2d 1547, 1551–52 (11th Cir. 1985). "This requirement is congruent with the Article III case or controversy requirement." *Hunters Run Prop. Owners Ass'n, Inc.*, 2019 WL 4694139, at *4 (citing *Aetna Life Ins. Co. of Hartford v. Haworth*, 300 U.S. 227, 239-40 (1937)). The actual controversy requirement "is jurisdictional and, thus, 'a threshold question in an action for declaratory relief must be whether a justiciable controversy exists.'" *Id.* (quoting *Odyssey Marine Exploration, Inc. v. Unidentified, Shipwrecked Vessel or Vessels*, 512 F. App'x 890, 895 (11th Cir. 2013) (quoting *U. S. Fire Ins. Co. v. Caulkins Indiantown Citrus Co.*, 931 F. 2d 744, 747 (11th Cir. 1991)).

Here, Plaintiff has not asserted facts sufficient to support his entitlement to declaratory relief. Indeed, Plaintiff has not set forth any factual allegations in his Complaint that could plausibly suggest a risk of future harm let alone a substantial risk of future harm. Instead, Plaintiff's Complaint simply asserts a conclusory entitlement to declaratory relief. And Halmu's allegations and arguments regarding the Miami Beach's purported treatment of other individuals after their arrest, which are asserted in his opposition brief, are not sufficient to salvage his Complaint because those allegations are not actually asserted in his Complaint. Nor are they tied to Halmu's risk of future harm. Therefore, the Court finds that Plaintiff has failed to state a claim for entitlement to declaratory relief.

For the reasons asserted above, it is **ORDERED and ADJUDGED** as follows:

1. Defendant's Motion to Strike or Dismiss (ECF No. 14) is **GRANTED**. Plaintiff's requests for injunctive and declaratory relief are **DISMISSED WITHOUT PREJUDICE**.

2. Plaintiff is directed to file an amended complaint within ten (10) days of the date of this Order in which he properly asserts his entitlement to expungement of his arrest record and declaratory relief.
3. In the interim, the Clerk is directed to administratively **CLOSE** this case solely for statistical purposes.

**DONE and ORDERED** in Chambers at Miami, Florida this 15th day of March 2021.

*Marcia G. Cooke*
MARCIA G. COOKE
United States District Judge

**Copies provided to:**

*Jonathan Goodman, U.S. Magistrate Judge*
*Counsel of Record*